May it please the Court, Susan Britton for Latino Issues Forum, Medical Advocates for Healthy Air, and the Sierra Club. My co-petitioner and I are splitting our time evenly, so for a total of 10 minutes I would like to reserve part of that for rebuttal. Your Honors, here is why we are here today. 1. EPA illegally gave the San Joaquin Valley a nine-year extension until December 31, 2010 to attain the national standards for particulate matter, and it illegally approved the Valley's attainment plan based on that extension. 2. EPA illegally failed to take action either by approving or disapproving the plan's contingency measures. 3. EPA had no authority to extend the Valley's attainment deadline by nine years. Section 188E of the Clean Air Act specifically prohibits EPA from extending a serious area's deadline by any more than five years. Section 188E also specifically requires that as a precondition to obtaining an extension, a serious area must demonstrate that its plan contains, quote, the most stringent measures included in any plan or implemented in practice in any state. EPA violated both of those mandates here. The practical effects of EPA's action are real. To begin with, by illegally extending the Valley's attainment deadline and by approving the plan based on that extension, EPA has eliminated the remedies that should apply in this case. Disapproval, as opposed to approval, would have triggered an immediate obligation on the part of EPA to promulgate a Federal implementation plan. It also would have triggered If they do that, even with a Federal plan in place, can't they entertain state revised plans? Yes, they can. If EPA determines that the state plan is now in compliance with the Clean Air Act. But your view of compliance is an attainment date no later than 2006. That's correct. Let's say that somebody gets an extension to 2006, puts the necessary measures in place, and that doesn't make it. EPA declares that it hasn't been attained at the end of 2006. Yes. Within a year, they've got to the state has to submit a revised plan. Is that correct? That's correct. That can't be approved, in your view, because its attainment date is going to be after 2006. Well, in a case like that, so I think Your Honor is positing a case where a state fulfills the requirements of the Act. So applies for an extension and obtains an extension and does the requisite demonstrations to get that extension. And then it doesn't make it. And then it doesn't make it at the end of 2006. In that case, Section 189d goes into effect, which requires that the state submit yet another revision to its plan. And what attainment date does that extension have? Well, Section 189d does not provide for a new attainment date. So what should the EPA do then? In approving a Section 189d revision to the original plan, the EPA has got to look at the revision as submitted, determine whether the revision demonstrates that emissions will be reduced by at least 5 percent per year. And not have an attainment date. Excuse me. And not have an attainment date. That's correct. Because the attainment date passed. The attainment date was 2006 in the situation that we're discussing right now. The standard applicable to that area is the standard that this Court articulated in Delaney. It is every possible measure to attain as quickly as possible. And the statute further clarifies by at least 5 percent per year. But what has happened here is that this is the very first time the Valley has gotten around to developing and submitting its serious area plan. This serious area plan was due in the mid-'90s. Its measures were supposed to have been implemented in by 1997. It was supposed to have attained the standards by 2001. And what it has done here is it has waited until all of those deadlines have passed. It has bypassed Section 188e and has tried to avail itself of a provision that does not authorize for any further extension. This is Section 189d. It is not an attainment deadline extension provision. I'm still somewhat at a loss. Supposing they don't make it on whatever date we pick or you pick. I don't care. What do you do? Do you then say, okay, the most stringent possible means to cut down air pollution in the San Joaquin Valley is to pave it. Do you pave the whole Valley? I'm sorry, I misheard. Pave. You know, like put blacktop over the whole Valley. It will cut down all the dust. It will cut down. You will have no ammonia particles floating around. You will have none of that stuff. We pave it. So you are positing sort of an extreme solution. Yeah, that's exactly. I want to find out what the ultimate sanction is. Well, the ultimate sanction for failing to attain, and the Clean Air Act is very specific about this. Offset sanctions do not kick in upon a failure to attain. Highway sanctions do not kick in upon a failure to attain. Nor does the Federal plan. The only provision that the Clean Air Act contains to address an area that has failed to attain is Section 189d. And this is the requirement that that area pull together every possible measure to demonstrate this 5 percent reduction requirement. So this could be on top of best available control measures, on top of most stringent measures. But the point of the statute. What provision are you talking about? The most stringent measures. Sanctions? Sanctions are contained in Section 179. Yeah, okay. I thought you said 189. Oh, excuse me. So did I answer Your Honor's question? No, I think so. But the point here is that there were sanctions and a Federal plan that were supposed to have been implemented, or at least sanctions that were supposed to have been initiated, and a Federal plan that was supposed to have been implemented upon this area's failure to submit a plan that complied with the outside attainment deadline. The San Joaquin Valley did not do that. Well, let's say what they did, they missed their first deadline. They didn't apply for an extension, or at least not effectively, anyway. So what should have ñ what does the Act require to have happen next? Well, the only way that an area can get an extension under the Act, this is under subpart 4, is to apply for an extension. If an area chooses not to apply for an extension, it does not have one. So its attainment deadline has passed. It's December 31st, 2001. And it's in violation. There's no question. Excuse me. And it's in violation. It hasn't made its attainment date. It's in violation, exactly. So if it submits a plan that does not demonstrate attainment by either 2001 or the extended deadline outside deadline of 2006, and that plan has to include most stringent measures, if an area chooses not to do that, it doesn't have an approvable plan. EPA has got to disapprove the plan. So then you're ñ then they would come in with a Federal plan, presumably. Exactly. And sanctions would be initiated, because disapproval sets in motion two types of sanctions. Eighteen months following disapproval, offset sanctions come into effect. Twenty-four months after a disapproval, holly sanctions come into effect, unless the plan's deficiencies are corrected before that time. And they can't be corrected because they missed their attainment date. Well, that the 2006 deadline has not yet expired. No, but they didn't apply for an extension. They haven't put in any of those. Well, then they missed their attainment date. The only way to get ñ They could put them in, but ñ and then if they go to 2006, they can't. In other words, see, what I'm getting at in these questions, I guess, is that you have a sort of a drop-dead date of 2006, but there are provisions in the Act that talk about what happens if you don't make that date. And one of the things that happens is the state submits plans. And I don't see any point in their submitting plans if, by your view, they cannot comply. They will have missed the 2006 drop-dead date. I don't quite agree with that. I mean, the Congress anticipated that this could happen, so what it did do was set a minimum baseline for this 5 percent provision. Well, that's in effect now. To take corrective ñ excuse me. Yeah, that's in effect now. That's in effect now. That's in effect now because what has happened is the valley has waited so long to submit this plan that what we are looking at now is, in effect, a combination plan and a revision to a plan. Really, these things are supposed to happen in series. An area is first supposed to submit its best available control measures. Then it's supposed to submit its attainment demonstration. Then it's supposed to implement its best available control measure. Then it's supposed to attain the deadline. If it looks like it can attain the deadline, it's supposed to apply for an extension. So all of these deadlines have lapsed. If they decrease by ñ has anybody done the math on if they decrease by 5 percent annually in the manner that you would say they should, when they would attain? I have not done the math. It's complex modeling, and I haven't ñ Right. It would be. Yeah. Do you want to watch your co-counsel? It's up to you, but I just ñ you've used ten minutes of your time. Do you know if the 5 percent provision in effect when attainment would be? I think we've ñ We haven't done the modeling in order to figure out. No, I'm sorry. No, I was just asking whether you wanted to yield to your co-counsel because you've used your ten minutes. But you can use your time however you want. Okay, Your Honor. I'll just say one more ñ mention one more point connected to what we've been talking about. The effect of what the valley has done here is to avail itself of a 9-year attainment deadline extension, whereas every other serious area that has obtained an extension has had to go through the specific avenue of Section 188. It has been required to demonstrate that its plan contains most stringent measures. The valley's plan does not have that demonstration, nor has EPA even pretended to approve the plan based ñ approve the plan in that it contains most stringent measures. It simply does not. Every other serious area has had to do so in order to obtain an extension. Every other serious area has been limited to a 5-year extension, and this Court has held that that kind of disparate treatment is unreasonable under the act in Delaney v. EPA. Your Honor, I see that I have surpassed 10 minutes. I ñ You may leave. Okay. So I see that I have ñ That's your counsel. We'll hear from you. Okay. Thank you. May it please the Court, my name is Brent Newell, attorney for the Petitioner Association of Irritated Residents. I'd like to reserve two minutes for rebuttal. Speak fast. I will. EPA's approval of the PM10 plan here violates the Clean Air Act in three ways. First, the plan uses reductions from best available control measures in the attempt to comply with the Section 189D, also known as the 5 percent plan. But Congress designed the act so that Section 189D reductions are in addition to and independent of the best available control measure reductions. Second, the plan fails to reduce PM10 or PM10 precursor emissions by the minimum 5 percent annual rate. And third, the plan fails to regulate major stationary sources of ammonia. Ammonia is a precursor along with oxides of nitrogen to the most prevalent form of PM10 in the Valley. It's called ammonium nitrate. The approval directly contradicts Congress's commands to reduce unhealthy levels of PM10 pollution. The Court should vacate that approval and order EPA to promulgate a Federal implementation plan. The first issue, EPA violates the act by using these backroom reductions in the attempt to comply with Section 189D. Again, these reductions are independent of Section 189D reductions because the structure of the act dictates a sequential process. First, the district is supposed to adopt a plan and submit it to EPA in 1994 that contains backroom rules. They're supposed to implement these rules no later than February 8th of 1997. What follows then ---- The component says that those are expected to stay in place, and they may stay in place for years. And why wouldn't they fall into the 5 percent reductions? Well, that's because for two reasons, Your Honor. First, when a rule is implemented, the reductions are taken credit, the plans take credit for those reductions immediately. Naturally, as long as the rule is implemented, those reductions continue. But you don't continue to experience more reductions from the same rule. That would be double counting. The second reason why their position is not correct is that Section 189D says that when you start this 5 percent reduction requirement, you do it from the most recent inventory. In this case, it was 2002.  Well, there's no question, is there, that if the last count is 2002, you've got to go 5 percent below that. Right. You start from 2002. That's when you start taking your reductions from that point. So a backroom rule that was implemented before where credit has already been taken and that pollution has already come out of the inventory, you don't take more credit for that rule later on.  What they're trying to do? I mean, I don't know. Actually, what's happening here is sources of PM10 pollution have never been subject to regulations. For example, agricultural on-field sources, they were never subject to regulation until this plan in 2003. Okay. Those reductions were implemented in 2004 and 2005. That's the kind of backroom reduction that they're trying to use here in the Section 189D plan. They can just – and to justify it, they can say, well, the last inventory is 2002 and we've taken 5 percent off as we go. And our response to that is you can't – the Act required those agricultural backroom emission reductions to occur no later than 1997. By taking them from that preattainment period into the postattainment period, the approval of the plan is eviscerating the purpose of Section 189D, which is to take effect after backroom reductions didn't do the job. Section 189D works like turning the screws on a district so that more reductions without regard to feasibility are required. If the Court were to adopt EPA's position, then EPA would be using backroom reductions instead of turning the screws. How often do they take inventories? Excuse me? How often do they take inventories? I believe it's every three years, Your Honor, but I could be mistaken. I'm going to move on to the second issue, unless the Court has any more questions about that particular one. Section 189D requires annual reductions of not less than 5 percent of either PM10 or PM10 precursors. Even with the plan incorrectly using these backroom reductions, the plan on its face fails to show those 5 percent reductions in 2006 through the end of the plan, which is 2010. EPA tries to overcome this problem by interpreting Section 189D to allow banking. And the way that works is that in 2004 and 2005, the plan takes NOFs reductions and sets them aside in like an account, for lack of a better word. During those two years, PM10 reductions from that ag backroom rule and another rule called Regulation 8 are used to meet the 5 percent requirement. In 2006 through 2010, those NOFs reductions in the bank account come out, and they're used to augment insufficient reductions in the final five years of the plan. Congress used the term annual. Now, using seven years of NOFs reductions in a five-year period is flatly inconsistent with what Congress directed. So under the first step of the Chevron analysis, their approval should be vacated. If the Court feels that this is somehow vague and we need to go on to the second step, EPA's interpretation is inherently unreasonable and should receive no deference. EPA admits two things when it says or first EPA says our interpretation is reasonable because we want to create an incentive to have early reductions. That interpretation is unreasonable, first because the plan uses BACM. EPA admits that. And in EPA's opposition brief, they concede that the district has no power to delay those BACM reductions. Again, they should have happened in 1997. So there's no incentive to move these reductions forward in the plan because they have no power to delay them since they are BACM reductions. Now, finally, I see that I have two minutes left. I just want to say, with respect to the last issue, that the approval violates Section 189e because Congress directed the standard for regulating precursor emissions, and EPA has turned that standard on its head by requiring scientific proof of efficacy and efficiency before they regulate precursors. I will sit down unless the Court has any other questions. Thank you. We'll give you a couple minutes on that problem. Thank you, Your Honor. Good afternoon, Your Honors. I'm Dave Carson here on behalf of Respondent EPA. With me today is Sarah Schneeberg from EPA's Office of General Counsel, Jan Tardash from EPA's Office of Regional Counsel, Phil Jay of the Air District, and Gavin McCabe of the State of California. Mr. Jay and I will be presenting our argument today. We've agreed that I'll take 15 minutes and Mr. Jay will take 5 minutes. These cases, of course, concern EPA's approval through notice and comment rulemaking of a number of State plan elements for the San Joaquin Valley nonattainment area, and because only legal issues have been raised in these cases, the overall issue is whether EPA's approval of the plan revisions are consistent with the relevant  I'd like to first turn to the requirements of Section 189D of the Clean Air Act. Because the San Joaquin Valley is a serious PM-9 attainment area that failed to meet its previous attainment date of December 31, 2001, Section 189D of the Clean Air Act governs and it requires two things. First, it required the State to develop a revised plan within one year of the failure to attain which plan must provide for attainment of the PM-10 standard at some point in the future, but the Act doesn't specify exactly what that date should be. Second, it requires a 5 percent plan. I'll address the attainment date issue first. Section 189D clearly contemplates that there will be a new attainment deadline because it requires a forward-looking plan providing for attainment in the future. But because it doesn't specify what the new attainment deadline should be, then EPA looked elsewhere in the Act to discern what that date should be. Specifically, EPA turned to Section 179D regarding failures to attain, which in turn refers to Section 170A2. These provisions together provide for attainment as expeditiously as practicable, which is the overarching goal of the Act with respect to nonattainment areas, but no later than five years after failure to attain, and also provides the possibility of an additional five-year extension depending upon the severity of pollution and the availability of control measures. Under these provisions, EPA has approved December 31, 2010 as the new attainment date because it determined that it is the most expeditious date by which the Valley can practically attain the standard. No one has challenged the factual underpinnings for that determination. Why doesn't this practice, as your opponent says, just totally constitute an end-run around 180AD? I mean, the five-year extension provision, which requires most stringent methods and things like that. Instead, you just ignore that. The district just ignores that whole process and doesn't have to bother with it. Congress has provided essentially two paths here. They provided one path under Section 180AD, where a state that recognizes that it may not attain the standard can come in and seek an extension of that deadline under the provisions of 188E and go through that process. But after EPA determines that a state has failed to attain, then it is clearly within Section 189D. Section 189D clearly says after a state has failed to meet any applicable deadline, regardless of whether it's the previous deadline before a 188E extension or the deadline after a 188E extension has been obtained, then they have to submit this plan. So there's really two paths here. And it's one thing to do. Kennedy. One requires them to do more than the other. I don't know why everybody doesn't just, if they, rather than apply for an extension, just let the deadline pass. That's not necessarily the case that it requires more to do than the other, Your Honor. In 188E, it clearly does require this exercise of going through an examination of most stringent measures from other states. But if you look at the language of the Act, it says attain as expeditiously as practical, which is the same standard that EPA has applied here. Under Section 189D, you have to get 5 percent reductions. And in some cases, say a state has already meeting all the most stringent measures that are feasible, and the statute does say feasible. It doesn't say every measure applied in another state. Only if those measures are feasible, and frankly, only if they are going to lead to attainment, then they'll be applied. So if a state is already doing that, it may very well want to put off having to get 5 percent reductions, because 5 percent is a significant amount of reductions. And if you look at the language of the statute. So there are incentives for applying for an extension. Certainly.  And if you look at the language of the statute, I mean, Section 189D contains no language indicating that Section 188E may be first applied. You know, it doesn't say the actual attainment date after 188E. So I wouldn't consider it to be an end run. I just consider it to be two different paths. I would also just point out on this issue, Your Honor, that Petitioners take the position that if you're outside of, in other words, if you miss your attainment deadline, then suddenly you're in this, what they call the Delaney standard, which is as soon as possible with all available measures. And I think Judge Duffy's question regarding pave the whole valley is an apropos one, because what are all possible measures, and is that really what Congress intended? I don't think so, because if you look at Section 189D, there's just no indication that Congress intended that. And I would point out, first of all, Delaney doesn't apply, because Delaney was a case where, prior to the 1990 amendments, where Congress had not provided these backup provisions, such as 189D and 179 and 172, which provide for an expeditiously practical attainment date. So we're not there anyway. But even if you just look at 189D, there's absolutely no indication. The Congress indicated those kinds of drastic measures, because if they had, they would have provided for it. And they wouldn't have said take a year to come up with a plan that has 5 percent reductions. They would have said impose all these all-available measures as soon as possible if they meant that. Would you explain to me the relationship of the sanctions provisions in 179 to these two different paths? Because when the sanctions kick in, I'm going to jump in. It's an automatic that sanctions be imposed. You know, that issue hadn't really been briefed here. My understanding is that the sanctions would kick in if EPA makes a determination that a State has failed to implement a plan or if EPA disapproves a plan. They would not kick in on a failure to attain the standard. Well, what happens? The sanctions are curable then. Okay. The sanctions are curable. What happens if the date that you've been set, you've set in, what is it, 2009? 2010. 10. What happens if there's, if at the end they still haven't attained? If at the end they still haven't attained, then they will have to get a new attainment date again under Section 189D. I think it's unlikely that that will happen because the 5 percent reductions over that time period will get them hopefully to attain it. Well, maybe they haven't made their 5 percent reductions. Yeah. What happens if they can't make the 5 percent reductions? Well, their plan shows that they will. You know, but they can't. Well, if they can't, then they don't need it. They're going to have to come up with a new 5 percent plan with new measures that will meet it. When? I mean, obviously, after they've failed to attain. At 2009? 10? In 2010. So at 2010, all that they get sanctioned for is you have to come up with a plan. That's correct, Your Honor. Somebody is then going to sit down and write out a plan. I wouldn't consider it a sanction. I'm sorry. I was overspecified. Yeah. It doesn't matter. You don't consider that a sanction? I don't consider it a sanction per se. We're trying to get the area into attainment. I understand that. I understand that. But you consider that not to be a sanction. I will agree with you. All right. Then what sanction is available then? If the San Joaquin Valley and the people, the Unified Air Pollution Control District, don't do anything, what sanction do you have? I don't understand. Well, first of all, they are doing something. We have a plan that has been approved which shows that it will be implemented, it will meet this attainment deadline, and they can't just sit back and not do anything. They have to implement the plan. Now, would you go with me just for a moment to that wonderful world of make-believe where they don't have a plan. They don't have anything. And they're not doing a darn thing about it. Okay? You haul them in and say, you need a plan. So they say, okay, fine, here's a plan. They give it to you and go out and do nothing. And they continue to do that. What do you do? They get to 2010, they've done nothing. Oh, they're giving you wonderful plans. The plans are delightful, you know, with all kinds of blue tabs and green tabs and so on and so forth. Who cares? What are you going to do? Frankly, Your Honor, I've never heard of that happening, so I don't know what would happen. Is there something in the statute which says if you don't do that, we will stop everyone from breathing? Of course not. Well, I don't care what the sanction is. It must be something. Congress did not provide a sanction for failing to meet the attainment date. Okay. Congress said come up with a plan, implement the plan if the plan is approved. That's all I wanted to know, there is no sanction. Not for failing to meet the attainment date, no. I would not consider the fact that they had to come up with a new plan with new 5 percent measures to be a sanction. I don't either. It's just the way the statute works. Okay. I vaguely recollect something in the statute about losing highway funds. Yeah, that's what I was trying to at some point there's an automatic imposition of taking away of highway funds. So when does that happen? My understanding is that that occurs when EPA has either made a failure to submit, in other words, that they failed to submit a plan or EPA disapproves the plan. Then there is such a thing as called a sanctions clock that starts running, and I think it's 18 months. And during that time period, then, they can cure. And where is that, that 18-month sanctions clock? That is in Section 179. 42 U.S.C. 7509. And, again, it provides an opportunity for the State to cure the deficiency. I mean, the idea is not to punish people. The idea is to get them into attainment. And here we have a plan that will get them into attainment by 2010, and no one has challenged the factual underpinnings for that finding. Could we go back a minute, because maybe I didn't quite grasp them all, to the incentives. If you don't – if you just let the deadline go without asking for an extension and if you ask for an extension, you're limited to a certain amount of time that's less than the – I think that's what's happening. Well, it's not – the thing of it is it's not necessarily – you're not necessarily going to get more time under – if you don't seek an extension and you proceed under 189D. Right. Because EPA could determine that you get even less than 5 years because the standard is as expeditiously as practical. So a State cannot then assume that just because they don't submit an extension request under 188E that they're going to get more time than they would otherwise. Because EPA might determine that expeditiously as practical in this case is 4 years. I mean, it's essentially – it's the same standard really under 188E and 189D. It's expeditiously as practical. The real difference is they have to go through this examination of most stringent measures in another case and see if they're feasible. But even under 179 and 172, they still have to implement all feasible measures. So, you know, there are some differences, but I don't think it's nearly as drastically different as Petitioners would have you believe. Well, the 5 percent reduction provisions go into effect when? They go into effect under section 189D. After EPA makes a failure to attain. After the failure to attain. After the failure to attain. So if you get an extension, then you don't need to make the 5 percent reduction. Because you don't have a determination value. EPA hasn't made a determination. There's been a failure to attain. If you go the other route, then you do. Correct. I see that my – I want to leave Mr. Jay 5 minutes, but I just wanted to touch very quickly on the issue of this 5 percent plan with respect to the BACM issue. I think I can do that in about 30 seconds. And Petitioners are just wrong that BACM may not be used because they read into the Act that there must be additional reductions of 5 percent. And the statute doesn't say that. The statute says 5 percent of the most recent inventory. It doesn't say additional reductions above and beyond what's contained in the State's payment demonstration. What are they – what is their position? Your position is that there are some control measures in effect and you don't have to look at them at all. You just look at the last inventory and say we're going 5 percent down from the last inventory. Is that correct? That's correct, Your Honor. It's an exercise of looking at the inventory and determining whether or not either existing measures are going to meet 5 percent, or if not, then you're going to need to have additional measures that meet 5 percent. Okay. And that's not necessarily required. Best available. And they're saying – By best available, correct. Or if best available doesn't get it, then other measures. And your opponents are saying – They're saying – If best available is causing some reduction from that last inventory, we've got to ignore it and get 5 percent more. Exactly. They're saying it's additional. The statute doesn't say additional. The statute just says 5 percent of the inventory. All right. Thank you. I'll let Mr. Jay have the remaining 4 minutes. Good morning. Philip Jay, District Legal Counsel for the Air Pollution District. The Clean Air Act is not a series of sections that are rigid, intractable, unchanging sections. All throughout the structure of the Act, Congress allowed districts and states to cure whatever defects there are. If you look at Section 179, it covers the issue on what the new attainment date is. It's titled, Sanctions and Consequences for Failure to Attain. If the district fails to do something, like fails to submit a plan, fails to implement measures, sanctions kick in to make the district do what it's supposed to do. In any case, when there's a non-attainment area that does not attain the standard, 179 says you use the new attainment date of Section 172. That is a mandatory section that Congress put in the Act. The 188E extension provision is permissive. A district may or may not decide to go down that track and seek an extension before an attainment date has elapsed. Here, the attainment date elapsed. EPA made a finding of failure to attain. Section 179 says the district has to do a new plan and a new date is established. In this case, the date is 2010. Section 179 also answers the question of whether you can use these back-up measures or not in determining the 5% reductions. It says, EPA follows Section 110 and 172, establishes the measures for this new plan, and such additional measures as may be necessary to meet that 5% per year. It may require new controls. It may not. In this case, the district submitted a plan that's got a mixture. It's got some new controls. It relies on some existing controls. The bottom line is it shows the 5% per year reductions. On that issue, the 5%, it's our contention that there is some flexibility there. And we've given a discussion in our brief on the legislative history of the 189D section and the 5% reductions. If you compare that section to the history of a parallel section, which dealt with carbon monoxide, both of these sections originally, when Congress was considering them, read the same. They both said you shall get annual reductions of 5%. They never really defined what they meant by annual, and we contend that term is ambiguous. After the bills went through conference, et cetera, the carbon monoxide section was changed specifically to add language that says, you have to get 5% per year for each and every year. They made it much more stringent and much more mandatory. While leaving the PM10 section, 189D, they left it alone and just gave us this 5% annual reduction. Well, each side has an argument. There's another provision that talks about averaging over the years, and this one doesn't. And it seems to me you can make the same argument the other way. The theory for averaging was to allow what they call backloading, to make it clear that in the ozone side you could take credit for measures at, say, year three versus year one. What we've done and what EPA has approved, and we think under Chevron it's a reasonable interpretation, is we front-loaded reductions. Any method you use, you're going to get 40% reductions at the end of the term. We've done it in a way to front-load them, get more reductions quickly, and that shows through modeling, et cetera, to be the best way that we could come up with scientifically to make the 5%. And EPA should get some deference, we contend, in approving that type of method. The statute is ambiguous. It's inherently scientific, this whole exercise of, you know, whether you include ammonia, whether you include, you know, how you do the 5%, new measures, old measures, et cetera. It's precisely the type of situation where the Supreme Court has said defer to the EPA, as long as it's reasonable. Let's say you're very successful and the first couple of years you get 10% reductions, and then they do a new survey. You've got to change the wording of the statute that says you have to reduce from the most recent 5% from the most recent survey? One thing I think that hasn't been set out in this whole case is these plans and rules, et cetera, it's very fluid. For example, the district will be doing yet another plan in 2006, and basically we step back, redo all the modeling, and say, okay, is this plan working? If this plan is not working, if it's behind, we redo it. It's my question. I guess you would have to say, well, I've done a new survey, but we still have 10% left, overage from the prior one, and we can adjust it. We'll have to do another plan. We will have to reduce that. It's an ongoing process. You have to demonstrate the EPA all the way along. I guess I'm not sure how your banking works when you have a new survey. In other words, you're over. You've gotten 10% in the first two years. That means you're 5%. You've got 5% per year banked. Right. They do a new survey. Does that mean for the first two years after that survey, if you wanted to, you could have no reductions? I don't think we would be allowed to do that because we have to continue making reasonable further progress. I don't think EPA would allow a situation through this approval where you could say I'm going to do 10% now, and then I'm not going to do anything for the rest of the time. That's what I understand the banking argument is. It's maybe not quite as simple as that, but there's a lot of science that goes in with it. And what it recognizes is some areas might have a dust problem, windblown dust, plus factories. You know, there could be a lot of variation. Are there hearings each time that you go back and look at this and adjust the plan? The theory is you have to adjust the plan. But are there hearings? I mean, can the public be heard? Oh, absolutely. Yes. Everything we do is done through a public process, both at the State level and the Federal level. But how are we doing this year? I just have curiosity since this is an ongoing process. There's actually ‑‑ it is outside the record. Although there is ‑‑ No, I'm asking that improperly. Well, there is an affidavit actually, though, in the court's file on the expediting this hearing date. Yeah. The district has not had but one exceedance of the standard in the last two and a half years. So in our mind, all this talk that the district has failed and has done nothing, keep in mind the district has been adopting rules and regulations since its inception, and we're basically within six months of hopefully attaining the standard. It's that last little percent that's really hard to get. We're in attainment, at least in the record, about 97% of the time. Things have been real good since we've submitted this plan, but it's, you know, all the low-hanging fruit is kind of done, and you're really squeezing businesses and industry and people to try to get that last little bit. Because to be in attainment, we have to be clean, basically, for three years. That's a very hard standard to meet. If you have one exceedance in three years, you didn't make it. And so, but so far, things in our mind are looking very good. We have a nice new courthouse, Federal courthouse under construction there that's going to be finished soon. We'll go up and we can check it out from there. Maybe the next hearing will be there. I'm sure Judge Coyle would love to see you. Thank you for your consideration. Thank you. Your Honor, if I could have five seconds.  Sure. In terms of if a State simply doesn't implement the plan, there are sanctions for that. Under section 179A4, EPA can find that any requirement of an approved plan is not being implemented, then the sanctions clock would start ticking at that finding. Also, under section 110M, if EPA finds that it's an egregious situation, then it could implement sanctions immediately. It wouldn't have to wait the 18 months. Sorry, I didn't know that. We hadn't briefed it, and I just didn't know. Okay. Thank you. I didn't either. Now we all do. If I could just take a minute on rebuttal. I'll give you two or three. Thank you. I just want to correct a misperception here. There are not two paths to getting an attainment deadline extension. There is one path to getting an attainment deadline extension, and that is section 188. I know.  This is a matter. Yeah. Right. I felt that. I understand. Okay. And, again, the reason for that is that Congress felt it necessary to have an absolute deadline in the Act and a specific provision to extend that deadline. Congress removed EPA's discretion to do exactly what EPA is trying to do in this case through the 1990 amendments by specifically addressing the situation in subpart 4. I did want to, and then just in relation to that, the reason, and then we have these absolute deadlines. If a State is unwilling or unable to do a plan that complies with these deadlines, whether it's the initial attainment deadline or it's unwilling or unable to do what it takes to get the extension, sanctions are imposed. The sanctions clock is initiated, I should say. The State still has a chance to correct them. And in this case, a Federal plan must be imposed immediately. EPA has a long outstanding obligation to do a Federal plan for the Valley, which this approval illegally cut off. I did want to say one thing about our second claim, which was contingency measures. Just very quickly, EPA has no authority to take no action on a required plan element. The Act is absolutely clear on this. There are two options. EPA can approve a plan element. It can disapprove a plan element. It can do these things in whole or in part. No action is not an option under the Act, and that is exactly what EPA has done here. And as to remedy, we are, of course, requesting that this Court vacate EPA's approval of this plan, order EPA to disapprove the plan and promulgate a Federal implementation plan forthwith. Okay. Very briefly. I have three quick points in rebuttal. First, there was some concern about whether there was a sanction for actually failing to attain the standard. That sanction is in the Act, and it's embodied in Section 189D. Yeah. Now, the structure of the Act prohibits the use of BACM. As I mentioned, the agricultural sources were not regulated until the 2003 PM10 plan was adopted. Allowing those BACM reductions that should have occurred before 1997 to be put in place in the 189D plan eviscerates that sanction. My second point is that the difference between the carbon monoxide section, Section 187G, and Section 189D is a distinction without a difference. 189D uses the term annual. 187G uses the term per year in each year in mandating reductions. The legislative history, the House report, shows that Congress meant the same thing when it used those two terms. The House report describes the annual reduction requirement in each section as per year in each year. So the House report describes 189D's annual requirement as per year in each year. It's the same language as 187G. Again, it's a distinction without a difference. Finally, the district was talking about the progress it was making in cleaning up the air in the San Joaquin Valley, and it said that it only had one exceedance of the standard in the last couple of years. That was one exceedance of one of the two PM10 standards that apply to the Valley. There is another standard, the annual average standard, which the Valley is not even close to coming into compliance with. So that annual average standard measures people's long-term exposure to PM10 pollution, and long-term exposure, as we've pointed out in the record, results in a significant number of deaths in the Valley. Thank you.  The case just argued is submitted for decision. We appreciate the quality of the argument presented in the matter. And that concludes the Court's calendar for this morning. The Court stands adjourned. Thank you. All rise. Thank you.
judges: Schroeder, Canby, Duffy